**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee/*
*Cross-Appellant*,

v.

VALENTINO JOHNSON,
*Defendant-Appellant/*
*Cross-Appellee*.

Nos. 16-10184
16-10225

D.C. No.
3:14-cr-00412-
TEH-1

OPINION

Appeal from the United States District Court
for the Northern District of California
Thelton E. Henderson, Senior District Judge, Presiding

Argued and Submitted September 14, 2017
San Francisco, California

Filed November 27, 2017

Before: Eugene E. Siler,* Richard C. Tallman,
and Carlos T. Bea, Circuit Judges.

Opinion by Judge Tallman

---

\* The Honorable Eugene E. Siler, United States Circuit Judge for the
U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

## SUMMARY[**]

### Criminal Law

The panel affirmed the defendant's conviction as a felon in possession of a firearm, and, on the government's cross-appeal, vacated the sentence and remanded for resentencing.

The panel held that the warrantless searches of the defendant's cell phone were constitutionally reasonable, given his status as a parolee and his reduced expectation of privacy. The panel held that delays in searching his phone were not unreasonable.

Regarding the defendant's argument that a handgun discovered during a search of his aunt's residence should have been suppressed, the panel held that the district court did not clearly err in finding that the defendant's aunt gave valid verbal consent for the search, where the district court credited the officers' testimony and not that of the defense witnesses.

The panel rejected the defendant's challenge to the admission of testimony from an officer about the defendant's aunt's out-of-court statements in a recorded interview. The panel held that the defendant's aunt's statements were not hearsay and their admission did not violate the defendant's Confrontation Clause rights, given the government's need to rebut the defendant's third-party culpability defense. The

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

panel held that, in any event, any error was harmless and did not affect the defendant's substantial rights.

The panel held that the district court did not abuse its discretion in denying the defendant's *Daubert* motion to exclude a firearms examiner's testimony and a written ballistics analysis.

Applying *United States v. Barragan*, 871 F.3d 689 (9th Cir. 2017), the panel, on the government's cross-appeal, vacated the defendant's sentence and remanded with instructions to treat the defendant's prior armed robbery conviction under Calif. Penal Code § 211(a) as a crime of violence under the Sentencing Guidelines.

## COUNSEL

Aaron T. Chiu (argued), Erin E. Wilk, and Niall E. Lynch, Latham & Watkins LLP, San Francisco, California, for Defendant-Appellant/Cross-Appellee.

Merry J. Chan (argued), Assistant United States Attorney; J. Douglas Wilson, Chief, Appellate Division; Brian J. Stretch, United States Attorney; United States Attorney's Office, San Francisco, California; for Plaintiff-Appellee/Cross-Appellant.

## OPINION

TALLMAN, Circuit Judge:

Valentino Johnson was convicted as a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) & 924(e), after an emergency 911 call reporting

an attempted suicide led San Francisco police to discover a handgun at the apartment where Johnson was temporarily staying while on parole. Johnson challenges the denial of two motions to suppress evidence gathered during the warrantless search of the residence and a subsequent warrantless search of his cell phone, which revealed incriminating evidence tying him to the gun. Johnson also appeals the admission of witness testimony on hearsay grounds, and he claims a violation of his Confrontation Clause rights at trial. Finally, Johnson challenges the denial of his *Daubert* motion to exclude expert ballistics testimony further linking him to the weapon found by the police.

The government cross-appeals the district court's determination at sentencing that Johnson's prior conviction for armed robbery under California Penal Code ("CPC") § 211(a) did not qualify as a "crime of violence" for purposes of establishing Johnson's base offense level. U.S.S.G. §§ 2K2.1, 4B1.2. We affirm the district court on all issues raised in Johnson's direct appeal, but vacate Johnson's sentence based on the government's cross-appeal and remand with instructions that a conviction under CPC § 211(a) qualifies as a crime of violence, warranting a base offense level of 24 under U.S.S.G. § 2K2.1(a)(2).

I

On February 2, 2014, Valentino Johnson's ex-girlfriend called 911 from Emeryville, California, to report that Johnson had threatened to kill himself with a gun. The caller informed the dispatcher that Johnson was at the home of his

aunt, Luana McAlpine,[1] in San Francisco, and that she had received a "hysterical" call from McAlpine alleging Johnson had shot himself.

San Francisco Police Department ("SFPD") officers were dispatched to McAlpine's apartment in a Bayview District public housing project. Before they arrived, responding officers received additional information about Johnson. Dispatch informed the officers that Johnson did not live at the Bayview District apartment. Mobile data terminal readouts from patrol car computers showed that Johnson's address on file with the California Department of Motor Vehicles was in Emeryville, across the bay, in Alameda County. But the readouts also showed that a domestic violence temporary restraining order had been issued on January 29, commanding that Johnson move out from the Emeryville address. Four days earlier, SFPD officers in the Bayview area, where McAlpine resided, had also received an All-Points Bulletin ("APB") advising that Johnson was a suspect in a recent armed burglary involving a damaged 9mm handgun. According to the APB, Johnson was currently on mandatory parole supervision and had prior arrests for murder, attempted murder, assault, kidnapping, false imprisonment, domestic violence, carjacking, and robbery.

Arriving officers discovered the 911 call had been a false alarm. They saw Johnson—alive and unharmed—peering down from an upstairs window, and officers asked to speak with Johnson and McAlpine outside. Johnson and McAlpine complied, but the parties dispute what happened next. We

---

[1] McAlpine later explained that she is not actually Johnson's blood relative, but rather that they are close friends who were at one time romantically involved.

credit the testimony admitted by the district court at the evidentiary hearing, after which the district judge made express credibility findings as to whose stories the fact-finder believed. SFPD Officer Wise testified that both McAlpine and Johnson stated that Johnson lived at the San Francisco residence. On direct examination, McAlpine testified she told police only she and her daughter, Norrisha Rivers, lived there. But on cross-examination, McAlpine testified she may have told officers that Johnson was either living or paroled there (and that Johnson had provided his parole officer with that address). The district court credited the officers' testimony.

McAlpine said that within minutes, more than a dozen officers had arrived at the scene. None had guns drawn. According to Officers Cader and Wise, they asked McAlpine if officers could check inside the apartment to ensure no one had been hurt, and McAlpine consented. McAlpine, on the other hand, testified that she assumed the officers were conducting a parole search (pursuant to a condition of Johnson's parole status, about which she previously knew), and therefore she felt she could not refuse entry to the officers. Wise testified he did not inform McAlpine that the search was a parole search. The search did not begin until McAlpine consented. The officers then proceeded to search the apartment without a warrant.

Inside the apartment, Officer Cader discovered a Taurus PT-92 semi-automatic 9mm pistol in a box in an upstairs bedroom used by Norissha Rivers. The magazine of the gun was missing, and part of the gun's heel was damaged. Officers also discovered 68 rounds of various types of ammunition in a dry bag on a second-floor balcony outside Rivers's bedroom. In Rivers's bedroom, they also found Johnson's clothing, mail, and three prescription bottles in his

name, as well as clothing belonging to Rivers's boyfriend, Jakieth Martin.

Outside the apartment, Sergeant Plantinga asked McAlpine in a recorded conversation about the gun's ownership. McAlpine responded, "I know it's not mine, I know it's not my daughter's, and there's only one other person it could've been, and that is Valentino Johnson." Plantinga had McAlpine sign a written consent form authorizing the search. McAlpine testified that, around the time of her conversation with Sergeant Plantinga, another officer threatened that she could lose her public housing if she was not honest and truthful. The officers denied that threat, stating that only after the gun was found did McAlpine become upset because it could cause her problems with the housing authority. The district court explicitly found that the testimony of the several officers was more credible than that of McAlpine.

During the search, officers handcuffed Johnson outside the apartment. Lieutenant Braconi explained to Johnson that SFPD was responding to a 911 call from his ex-girlfriend about an attempted suicide. Johnson told Lieutenant Braconi to check the call logs and text messages on his cell phone to prove he had not contacted his ex-girlfriend or threatened to kill himself. Braconi verified that no calls were made from Johnson's cell phone around the time of the 911 call.

After the gun was discovered, Johnson was taken into custody. During an interview with Sergeants Jonas and Plantinga at the Bayview police station, Johnson said he had been staying with McAlpine because he had fought with his ex-girlfriend and later had been served with a restraining order. He told Jonas and Plantinga to again "look at the text messages on [his] phone" to verify that he had tried to reconcile with his ex-girlfriend around January 21, 2014.

After the interview, Johnson remained in custody and his phone was given to Sergeant Jonas for forensic analysis.

Three days later, on February 5, 2014, SFPD's multimedia forensics unit reported to Jonas that they were unable to make a digital copy of the phone's contents because the phone was too new for the unit's software. Instead, Jonas searched the phone by hand without first obtaining a warrant. Sergeant Jonas scrolled through old text messages sent from Johnson's phone, making screen shots of relevant information. He found an incriminating text sent on January 28, 2014, that read: "Who you know that has 9-mm clips? I just busted mine. It's a PT-92 Taurus. . . . So how do I get it?" One year later, on February 2, 2015, after Johnson had been indicted on federal charges but before trial, the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF") obtained a search warrant for the phone, and the text message was admitted at trial.

II

On July 31, 2014, a federal grand jury indicted Johnson on a single count of being a felon in possession of the handgun, in violation of 18 U.S.C. §§ 922(g)(1) & 924(e).[2] Before trial, Johnson moved to suppress the handgun and text messages found on his cell phone as the products of illegal searches. After conducting an evidentiary hearing to establish the facts, the district court denied the motions on the grounds that McAlpine had consented to the search of

---

[2] The grand jury later returned a superseding indictment, adding an additional count of obstruction of justice, 18 U.S.C. § 1512(c)(2), after Johnson was recorded on jail telephones suborning perjury from McAlpine as to who owned the gun. The district court severed that count before trial on the gun charge, and the government voluntarily dismissed it after the jury returned a guilty verdict on the felon in possession charge.

her apartment and that the warrant requirement does not apply to searches of parolees' cell phones. The court also allowed into evidence at trial, over objection, testimony from Jonas regarding McAlpine's statement to Sergeant Plantinga that the gun must have belonged to Johnson. Additionally, the court denied Johnson's motion to exclude expert testimony from SFPD's ballistics expert, Mark Proia. After a five-day trial, the jury returned a guilty verdict.

Johnson was sentenced on April 4, 2016. When calculating Johnson's base offense level, the district court declined to classify Johnson's prior armed robbery conviction under CPC § 211(a) as a crime of violence for purposes of the career-offender enhancement. *See* U.S.S.G. § 2K.1(a)(2). The court therefore assumed Johnson had only one prior conviction for a crime of violence, a 1994 conviction for assault with a firearm, and calculated the base offense level as 20. *See* U.S.S.G. § 2K.1(a)(4)(A). The court applied a two-level enhancement for the attempted obstruction of justice. *See* U.S.S.G. § 3C1.1. With a criminal history category of V, the court calculated the Guidelines range as 77 to 96 months, and imposed a sentence of 96 months in prison. The district court entered final judgment, and Johnson timely appealed. The government cross-appealed the district court's sentencing determination. We have jurisdiction under 28 U.S.C. § 1291.

III

Johnson first argues that the warrantless searches of his cell phone violated his Fourth Amendment rights. He asks us to find that *Riley v. California*, 134 S. Ct. 2473 (2014), and our decision in *United States v. Lara*, 815 F.3d 605 (9th Cir. 2016), apply to parolees. *Riley* held that warrantless searches of cell phones incident to arrest violate the Fourth Amendment, 134 S. Ct. at 2485, while *Lara* held that the

same principle applied to suspicionless searches of probationers' cell phones, 815 F.3d at 612. Johnson further contends that his Fourth Amendment rights were violated because the searches of his cell phone were unreasonably delayed.

The government responds that *Riley* and *Lara* do not apply in the parolee search context because the balance of privacy interests and factual circumstances in this context are different. Alternatively, the government argues that, even if the Constitution normally requires warrants for searches of parolees' cell phones, no constitutional violation occurred here, because: (1) Johnson consented to a search of his phone; (2) any constitutional error was cured by the later-obtained federal warrant; and (3) the searching officers' conduct falls under the good-faith exception to the exclusionary rule given the state of the law at the time of the trial. Because Johnson's status as a parolee significantly diminishes his privacy interests compared to the defendants in *Riley* and *Lara*, we affirm the district court's ruling.[3]

A

We review the denial of Johnson's suppression motion *de novo*, and "the district court's factual findings for clear error." *United States v. Sullivan*, 797 F.3d 623, 632–33 (9th Cir. 2015). "[T]he ultimate touchstone of the Fourth Amendment is reasonableness." *Riley*, 134 S. Ct. at 2482 (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). Determining the reasonableness of a particular search involves balancing "on the one hand, the degree to which [the search] intrudes upon an individual's privacy, and on

---

[3] Because we affirm on this ground, we do not reach the government's alternate arguments.

the other, the degree to which [the search] is needed for the promotion of legitimate governmental interests." *Lara*, 815 F.3d at 610 (alterations in original) (quoting *United States v. Knights*, 534 U.S. 112, 119 (2001)).

We have repeatedly recognized that status as a parolee[4] significantly diminishes one's privacy interests as compared to the average citizen. *See Samson v. California*, 547 U.S. 843, 850 (2006). "[P]arole is an established variation on imprisonment of convicted criminals" and granted only "on the condition that the prisoner abide by certain rules during the balance of the sentence." *Id.* (quoting *Morrissey v. Brewer*, 408 U.S. 471, 477 (1972)). Parolees are thus subject to various state-imposed intrusions on their privacy, including mandatory drug tests, meetings with parole officers, and travel restrictions. *Id.* at 851. California law also specifically provides that all parolees shall be "subject to search or seizure by a probation or parole officer or other peace officer at any time of the day or night, with or without a search warrant or with or without cause." Cal. Penal Code § 3067(b)(3).

"[R]estrictions on a parolee's liberty are not unqualified," however, and parolees still enjoy limited

---

[4] Although Johnson was classified as being under "mandatory supervision" by a parole officer under CPC § 1170(h)(5)(B), we have previously held that "the State's interest in supervising offenders placed on mandatory supervision is comparable to its interest in supervising parolees." *See United States v. Cervantes*, 859 F.3d 1175, 1181 (9th Cir. 2017), *as amended*, __ F.3d __ (Sept. 12, 2017). Therefore, we conduct our analysis and refer to Johnson as a "parolee."

Fourth Amendment rights.[5]  *Samson*, 547 U.S. at 850 n.2. Recent case law emphasizes that even offenders with otherwise reduced privacy expectations—arrestees in *Riley*, and probationers in *Lara*—have a right to be free from unreasonable searches of their cell phones.  In *Riley*, the Supreme Court reasoned that because cell phones store vast quantities of sensitive data, and because cell phones have become ubiquitous, the privacy interests implicated in cell phone searches are particularly acute.  *See* 134 S. Ct. at 2489–91.  Unlike other types of searches, the search of a person's cell phone can "typically expose . . . far *more* than the most exhaustive search of a house," as modern cell phones contain "[t]he sum of an individual's private life." *Id.* at 2489, 2491.  The unique features of cell phones led the Court to conclude that

> [c]ell phones differ in both a quantitative and a qualitative sense from other objects that might be kept on an arrestee's person.  The term "cell phone" is itself misleading shorthand; many of these devices are in fact minicomputers that also happen to have the capacity to be used as a telephone.  They could just as easily be called cameras, video players, rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps, or newspapers.

*Id.* at 2489.  *Riley*'s emphasis on the almost *sui generis* nature of cell phones weighed heavily in *Lara*.  In that case, despite the defendant's status as a probationer, and even

---

[5] For example, California courts have held that parole searches violate the Fourth Amendment if they are "arbitrary, capricious, or harassing."  *People v. Reyes*, 968 P.2d 445, 450 (Cal. 1998).

though he agreed to "submit [his] person and property, including any residence, premises, container or vehicle under [his] control to search and seizure" as a term of his probation, we ultimately concluded that the defendant's privacy interest "was substantial in light of the broad amount of data contained in, or accessible through, his cell phone." *Lara*, 815 F.3d at 611–12. Under *Riley* and *Lara*, therefore, Johnson's claim of an enhanced privacy interest in the contents of his cell phone appears weighty.

As previously noted, however, the government's interest in supervising parolees is "substantial." *Samson*, 547 U.S. at 853. Those interests include combating recidivism, promoting reintegration, and effectively detecting parole violations. *Id.* at 853–54. Requiring officers to obtain a warrant before searching a parolee's cell phone would often undermine the state's ability to supervise effectively thousands of parolees and prevent concealment of criminal conduct as in the case here. *See id.* at 854. *Lara* held that these governmental interests were ultimately insufficient to overcome a probationer's substantial privacy interest in his cell phone, although the government's interests were reduced when the suspected probation violation (missing an appointment with the probation officer) was not a serious or violent crime. *See* 815 F.3d at 612.

Despite these significant competing interests, we hold that the warrantless searches of Johnson's cell phone were constitutionally reasonable, given Johnson's status as a parolee. Johnson's parolee status may be of even greater concern here due to his lengthy and serious criminal history involving violent offenses. But most persons released on parole supervision are completing a sentence that involved incarceration for serious offenses. We do not think a workable rule can be fashioned for officers on the street

based on an argument that police should first examine the severity of the parolee's prior criminal record in determining whether or not they may conduct a warrantless search of a parolee or his cell phone when the parolee is subject to a search condition.[6]

While privacy interests in cell phones are significant, Johnson's parole status alone distinguishes our case from *Lara* and *Riley*. It is well established that parolees have reduced privacy interests compared to probationers, *see, e.g.*, *Samson*, 547 U.S. at 850; *Lara*, 815 F.3d at 610, and even more so compared to those persons who have been arrested but not convicted. Indeed, "[o]n the 'continuum' of state-imposed punishments," parolees appear to hold the most limited privacy interests among people convicted of a crime but are not actually imprisoned. *See Samson*, 547 U.S. at 850 (explaining that "parole is more akin to imprisonment" than probation, and that "parole is an established variation on imprisonment of convicted criminals" (quoting *Morrissey*, 408 U.S. at 477)). Moreover, as a parolee, Johnson knew that under CPC § 3067, he could be searched "at any time of the day or night, *with or without* a search warrant or *with or without* cause." (emphasis added). This search condition sweeps more broadly than the probation search condition at issue in *Lara*, which we held did not apply to cell phone searches because the search condition in *Lara* referred specifically to searches of "containers" and "property." 815 F.3d at 610–11.

---

[6] Before commencing parole, the parolee is informed and must acknowledge in writing that he and his property are subject to the warrantless search condition under CPC § 3067(b)(3). Both McAlpine and Johnson admitted they were aware of this condition of Johnson's mandatory parole supervision before police arrived at the Bayview apartment.

The government's interests in searching Johnson's cell phone were also weightier than the governmental interests at stake in *Lara*, where the cell phone search occurred after the defendant missed a probation meeting.  Accordingly, we held that this violation was "worlds away from the suspected crimes"—such as arson and homicide—that had justified warrantless searches of probationers' homes in other cases. *Id.* at 612 (distinguishing *Knights*, 534 U.S. at 112, and *United States v. King*, 736 F.3d 805, 806 (9th Cir. 2013)). Here, at the time of the cell phone search, officers knew Johnson had a violent criminal history, and had reason to believe his cell phone contained evidence of serious parole violations, including possession and use of a firearm in a residential burglary.  As such, there was no evidence showing that the officer's purpose in trying to determine what had happened was "arbitrary, capricious, or harassing." Therefore, because Johnson was a parolee, subject to CPC § 3067(b)(3), and under the Fourth Amendment he had a reduced expectation of privacy, we affirm the district court's finding that the search of Johnson's cell phone did not violate his Fourth Amendment rights.

B

Independent of the warrantless searches of his cell phone, Johnson alleges that his Fourth Amendment rights were violated because the cell phone searches conducted on February 5, 2014, and February 2, 2015, unconstitutionally prolonged the seizure of his phone.  "An unreasonable delay between the seizure of a package and obtaining a search warrant may violate [a] defendant's Fourth Amendment rights."  *Sullivan*, 797 F.3d at 633.  "The touchstone is reasonableness."  *Id.*

We hold the delays in searching Johnson's phone were not unreasonable.  Johnson had reduced privacy interests in

his phone given his parolee status, and Johnson never sought return of his phone while he was in continuous custody since he was arrested on February 2, 2014. *See id.* at 633–34 (holding that a 21-day delay before the search of a parolee's laptop was reasonable). The government obtained the phone lawfully, and there is no evidence the delays were the result of dilatory tactics by the state. *See United States v. Mulder*, 889 F.2d 239, 241 (9th Cir. 1989) (finding a one-year delay reasonable, where the defendant's pills were not obtained "as the result of an unlawful search," the defendant "never made a motion for the return of the pills," and "the time lapse was the result of the judicial appeal process rather than any dilatory tactics"); *see also United States v. Burnette*, 698 F.2d 1038, 1049 (9th Cir. 1983) ("[O]nce an item . . . has been lawfully seized and searched, subsequent searches of that item, so long as it remains in the legitimate uninterrupted possession of the police, may be conducted without a warrant."). Furthermore, the initial three-day delay occurred because SFPD's multimedia unit was unsuccessful in attempting to download the contents of the phone, which was too new for the unit's imaging software. And the February 2, 2015, search was conducted under authority of a search warrant for which there was ample probable cause. Under the totality of the circumstances, the delays were reasonable and did not render the searches "arbitrary, capricious, or harassing." *See Reyes*, 968 P.2d at 450.

IV

Johnson next argues that the district court erred in finding (1) that McAlpine gave valid consent to the search of her apartment, or (2) in the alternative, that the responding officers conducted a lawful parole search. Accordingly, he argues that the handgun discovered during the search of

McAlpine's residence should have been suppressed.  The factual findings of the district court resolve the issue. Despite the conflicting testimony of the witnesses reflected in the record, we hold that the district court did not clearly err in finding that McAlpine gave valid verbal consent for the search because the district court credited the officers' testimony and not that of the defense witnesses.

We review a district court's factual determination of valid consent to a search for clear error.  *United States v. Washington*, 490 F.3d 765, 769 (9th Cir. 2007).  The government bears "the burden of proving that the consent was, in fact, freely and voluntarily given."  *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968).  "Whether consent to search was voluntarily given or not is 'to be determined from the totality of all the circumstances.'"  *United States v. Chan-Jimenez*, 125 F.3d 1324, 1327 (9th Cir. 1997) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)).  We consider five factors to assess whether consent was voluntary:

> (1) whether defendant was in custody; (2) whether the arresting officers have their guns drawn; (3) whether *Miranda* warnings have been given; (4) whether the defendant was told he has a right not to consent; and (5) whether defendant was told a search warrant could be obtained.

*United States v. Russell*, 664 F.3d 1279, 1281 (9th Cir. 2012) (quoting *United States v. Morning*, 64 F.3d 531, 533 (9th Cir. 1995)).  The rule is that failing to object to police entry, when no request for permission to enter was made, does not constitute effective consent.  *United States v. Shaibu*, 920 F.2d 1423, 1428 (9th Cir. 1990).

Here, it is undisputed that McAlpine was not in custody when she was questioned, and officers did not have their weapons drawn.  No *Miranda* warnings were given, but "[i]t would . . . make little sense to require that *Miranda* warnings . . . be given by police before requesting consent." *Russell*, 664 F.3d at 1281 (quoting *United States v. Vongxay*, 594 F.3d 1111, 1120 (9th Cir. 2010)).  Nothing in the record establishes that McAlpine was told she had a right not to consent, so the fourth factor weighs in Johnson's favor. There is no evidence that McAlpine was told that a search warrant could be obtained, so as to imply that her refusal to consent would be fruitless, though she said she knew Johnson was subject to a warrantless search condition because he was on parole.  The *Russell* factors, therefore, weigh in favor of upholding the district court's finding that McAlpine's consent was freely given.

Johnson argues the record establishes that the search of McAlpine's residence was conducted as a parole search, and the government has tried *post hoc* to justify the warrantless search as a consent search.  He relies on McAlpine's testimony that one of the officers told her they would conduct a parole search, and therefore she felt she "had no other choice" but to allow the officers entry.  He also points to the testimony of Officers Vannuchi, Ortiz, Basurto, Plantinga, and Cader, who all testified they understood they were conducting a parole search.  Johnson further asserts that McAlpine could not give valid consent because she felt pressured by the number of officers present, and she was threatened with having her public housing taken away. Johnson also contends that racial dynamics played a role.

Although there is evidence to support Johnson's contention that later-arriving officers believed they were conducting a parole search, the officers who first

interviewed McAlpine—Wise and Cader—testified otherwise. They both said that they asked McAlpine if she would permit officers to check the apartment to make sure no one was hurt and to secure any weapon, and she agreed. Wise's incident report reflects this account. Wise also testified that he did not hear any officer tell McAlpine that they were conducting a parole search. Sergeant Plantinga testified he thought it was *both* a parole search and a consent search. Regarding the alleged threat to McAlpine's continued public housing eligibility, the district court credited evidence that McAlpine became upset about losing her housing *after* the gun was discovered, not before the search occurred. Prior to that development, officers testified that relations with McAlpine were cordial and polite when she gave consent.

Given this conflicting testimony and the district court's conclusion that the officers testified more credibly, we hold that the district court did not clearly err in finding McAlpine gave valid verbal consent for the search.[7] The record does not compel the conclusion that McAlpine could not validly consent because the officers told her they were conducting a parole search. Even if later-arriving officers assumed they were conducting a parole search, the record supports the court's factual finding that McAlpine first verbally consented to the search after Wise and Cader asked if they could enter the residence to ensure that everyone inside was safe.

---

[7] The district court properly concluded that McAlpine's *written* consent, provided after the search had already occurred, did not retroactively establish valid consent. *United States v. Howard*, 828 F.2d 552, 556 (9th Cir. 1987). It is, however, corroborative of the officers' testimony that she had earlier consented orally to the search.

V

Johnson also challenges the admission of testimony at trial from Sergeant Jonas about McAlpine's out-of-court statements to Plantinga in a recorded interview. Jonas testified, "[McAlpine] said there was only one person [the gun] could belong to, and that was Valentino Johnson." Johnson contends that Jonas's testimony was hearsay and violated Johnson's Confrontation Clause rights. But Johnson's defense theory offered to the jury was that the gun belonged to his cousin, Jakieth Martin. Given the government's need to rebut Johnson's third-party culpability defense, we hold that McAlpine's statements were not hearsay and did not violate his constitutional rights. *See Tennessee v. Street*, 471 U.S. 409, 414 (1985) (permitting evidence as nonhearsay when used to rebut the defense theory).

We review the interpretation of the rule against hearsay *de novo*, *United States v. Mitchell*, 502 F.3d 931, 964 (9th Cir. 2007), and the admission of evidence under a hearsay exception for abuse of discretion, *United States v. Molina*, 596 F.3d 1166, 1168 (9th Cir. 2010). Generally, we review whether the admission of evidence violated the Confrontation Clause *de novo*, but if the defendant failed to raise a Confrontation Clause objection at trial, we review for plain error. *United States v. Matus-Zayas*, 655 F.3d 1092, 1098 (9th Cir. 2011).

Hearsay is an out-of-court statement offered for the truth of the matter asserted. Fed. R. Evid. 801(c). The Confrontation Clause forbids "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004). "*Crawford* applies

only to testimonial *hearsay*, and 'does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.'"  *United States v. Wahchumwah*, 710 F.3d 862, 871 (9th Cir. 2013) (quoting *Crawford*, 541 U.S. at 59).

Here, McAlpine's statements to Sergeant Plantinga were clearly testimonial, because they were "[s]tatements taken by [a] police officer[] in the course of interrogations."  *See Crawford*, 541 U.S. at 52.  Furthermore, although McAlpine testified at the suppression hearing, she did not testify at trial and the government did not show that she was unavailable.  Whether McAlpine's out-of-court statements were hearsay and violated the Confrontation Clause thus hinges on whether the statements were admitted for a legitimate nonhearsay purpose.  The government asserts that McAlpine's statements were not offered for their truth, but to explain why the government focused its investigation on Johnson rather than Jakieth Martin.  The government contends this was relevant to rebutting Johnson's suggestion that the gun belonged to Martin, and that SFPD's failure to investigate Martin was sloppy police work.

Courts must exercise caution to ensure that out-of-court testimonial statements, ostensibly offered to explain the course of a police investigation, are not used as an end-run around *Crawford* and hearsay rules, particularly when those statements directly inculpate the defendant. *See, e.g.*, *United States v. Silva*, 380 F.3d 1018, 1020 (7th Cir. 2004) ("Allowing agents to narrate the course of their investigations, and thus spread before juries damning information that is not subject to cross-examination, would go far toward abrogating the defendant's rights under the sixth amendment and the hearsay rule."). We previously have rejected the government's proffered nonhearsay

rationale when, for example, explaining that the course of the police investigation was not relevant to the government's case. *See, e.g.*, *United States v. Dean*, 980 F.2d 1286 (9th Cir. 1992); *United States v. Makhlouta*, 790 F.2d 1400 (9th Cir. 1986). In these cases, we determined the out-of-court statements were inadmissible because they were not relevant to prove anything *other* than their truth. But here, McAlpine's statements were relevant to rebutting Johnson's theory of the case: to rebut Johnson's claim that the police were sloppy and had no reason to investigate Johnson's property, rather than investigate Jakieth Martin's.

To ensure further that McAlpine's out-of-court statements would not be considered for their truth, the district court properly and contemporaneously instructed the jury that the statements were to be considered only for nonhearsay purposes. The jury was again reminded of this admonition in the final jury instructions. And the prosecution made no reference to McAlpine's statements during closing arguments. *Cf. Ocampo v. Vail*, 649 F.3d 1098, 1112–13 (9th Cir. 2011) (finding that the prosecution's reliance on out-of-court statements during closing arguments indicated that the statements were intended for a hearsay purpose). The district court therefore did not abuse its discretion in admitting Jonas's testimony for a legitimate nonhearsay purpose.

But even if Jonas's testimony was inadmissible hearsay, we find that any error was harmless and did not affect Johnson's substantial rights. *See United States v. Blandin*, 435 F.3d 1191, 1195 (9th Cir. 2006). Setting aside McAlpine's statements, the government presented compelling additional evidence to link Johnson to the gun, including the text messages on Johnson's phone, the

evidence from the prior armed burglary, and ballistics evidence.

VI

Finally, Johnson appeals the denial of his *Daubert* motion to exclude expert testimony from an SFPD firearms examiner, Mark Proia, as well as a written ballistics analysis produced by the SFPD firearms unit.[8]  This evidence linked a test bullet fired from the PT-92 Taurus found at the San Francisco residence to a live round recovered from the scene of a burglary to which Johnson's brother pled guilty in 2011.  Proia's testimony and the written report relied on the Association of Firearm and Toolmark Examiners ("AFTE") methodology, which involves making feature-comparisons of bullet markings ("striations") to determine if different bullets were fired from the same gun.[9]  Johnson argues that Proia misapplied the AFTE methodology and that the methodology is inherently unreliable under the *Daubert* factors.[10]  We review the district court's admission of expert

---

[8] The government initially planned to offer expert testimony through Tasha Smith, an SFPD firearms examiner trainee who authored the ballistics report under Proia's supervision.  Johnson's *Daubert* motion thus focused on Smith's planned testimony, even though Proia ultimately testified at trial.

[9] Specifically, the AFTE methodology involves identifying three types of toolmarks:  (1) class characteristics, which are features shared by many weapons of the same type; (2) individual characteristics, which are unique to a particular weapon; and (3) subclass characteristics, which may be common to a small group of firearms manufactured at the same time. *United States v. Monteiro*, 407 F. Supp. 2d 351, 360–61 (D. Mass. 2006) (describing the methodology in detail).

[10] These factors are:  (1) whether the method has been tested; (2) whether the method "has been subjected to peer review and

testimony for abuse of discretion.  *United States v. Cazares*, 788 F.3d 956, 975–76 (9th Cir. 2015).

First, Johnson contends that Proia misapplied the AFTE methodology, because Proia testified that the test-fired bullet matched a bullet recovered from the 2011 crime scene "to a reasonable degree of ballistics certainty," and because the written report in no way qualified its conclusion that the two bullets matched.  He points out that the National Academy of Sciences has sharply criticized the AFTE methodology for failing to incorporate standardized protocols and for over-reliance on the subjective judgments of examiners.  Indeed, in light of these flaws in the AFTE methodology, a number of district courts have required that experts clarify that bullets can be matched only to a "reasonable degree of ballistics certainty"—disallowing experts from presenting their conclusions with absolute certainty.  *See, e.g.*, *United States v. Cerna*, No. CR 08-0730 WHA, 2010 WL 3448528, at *4 (N.D. Cal. Sept. 1, 2010); *United States v. Diaz*, No. CR 05-00167 WHA, 2007 WL 485967, at *11 (N.D. Cal. Feb. 12, 2007); *Monteiro*, 407 F. Supp. 2d at 372; *United States v. Green*, 405 F. Supp. 2d 104, 124 (D. Mass. 2005).[11] This qualification is meant to ensure that juries are not

publication;" (3) "the known or potential rate of error;" (4) whether there are "standards controlling the technique's operation;" and (5) the general acceptance of the method within the relevant community.  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592–95 (1993).  "[W]hether these specific factors are 'reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine.'"  *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)).

[11] At least one court did not even take this precaution.  *United States v. Casey*, 928 F. Supp. 2d 397, 400 (D.P.R. 2013) ("[The witness] may testify accordingly without qualification of his degree of certainty.").

misled about the reliability of ballistics evidence. Johnson points to only one case in which a "reasonable degree of ballistics certainty" was determined to be too misleading. *United States v. Glynn*, 578 F. Supp. 2d 567, 574–75 (S.D.N.Y. 2008) (allowing the expert to testify it was "more likely than not" that bullets matched).

Here, although the written report did not qualify its test results, Proia's testimony made clear he could conclude only that the test-fired bullet matched the bullet from the 2011 crime scene to a "reasonable degree of ballistics certainty." Proia also clarified in his live testimony that the written report's conclusions were not absolutely certain. Additionally, Johnson was allowed to cross-examine Proia on the more precise meaning of "reasonable degree of ballistics certainty," and to present his own ballistics expert witness. The district court therefore provided adequate safeguards to allow the jury properly to evaluate the probative value of Proia's opinion testimony and the written report.

Second, Johnson contends that the AFTE is inherently unreliable and fails to satisfy the *Daubert* factors. The district court cited a number of cases and scientific sources establishing that that the AFTE methodology satisfies *Daubert*. Conversely, Johnson has not cited a case in which AFTE ballistics testimony was excluded altogether. Because the district court has "broad latitude" to make admissibility determinations, *Estate of Barabin*, 740 F.3d at 463, we hold that the district court did not abuse its discretion in denying Johnson's *Daubert* motion.

## VII

The government cross-appeals the district court's determination at sentencing that Johnson's prior armed

robbery conviction under CPC § 211(a) does not qualify as a "crime of violence" within the meaning of U.S.S.G. §§ 2K2.1 and 4B1.2. Because the district court held that Johnson's prior armed robbery conviction was not a crime of violence, it adopted the base offense level assuming that Johnson had only one prior conviction for a crime of a violence rather than two. As a result, Johnson's base offense level was 20 rather than 24. *Compare* U.S.S.G. § 2K2.1(a)(2), *with* U.S.S.G. § 2K2.1(a)(4)(A).

We recently addressed this issue in *United States v. Barragan*, holding unequivocally that a prior California robbery conviction is categorically a "crime of violence" for purposes of the career offender sentencing provision. 871 F.3d 689, 714 (9th Cir. 2017); *see also United States v. Chavez-Cuevas*, 862 F.3d 729, 740 (9th Cir. 2017) (affirming a district court's reliance on *United States v. Becerril-Lopez*, 541 F.3d 881 (9th Cir. 2008), in classifying CPC § 211 as a "crime of violence"). Therefore, we vacate Johnson's sentence and remand to the district court for resentencing with instructions to treat Johnson's CPC § 211(a) conviction as a crime of violence in determining the applicable base offense level.

## VIII

We **AFFIRM** the district court's ruling on each of the issues raised in Johnson's direct appeal; **VACATE** Johnson's sentence; and **REMAND** for resentencing on a properly calculated total offense score.