21CA1665 Peo v Costello 11-27-2024

COLORADO COURT OF APPEALS

---

Court of Appeals No. 21CA1665
Arapahoe County District Court No. 20CR1875
Honorable Elizabeth Weishaupl, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Cameron Scott Costello,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE YUN
Harris and Graham*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced November 27, 2024

---

Philip J. Weiser, Attorney General, Allison S. Block, Assistant Attorney General Fellow, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Kamela Maktabi, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1    Cameron Scott Costello appeals the judgment of conviction entered on a jury verdict finding him guilty of first degree murder. He contends that the district court made multiple evidentiary errors requiring reversal of his conviction.  We disagree and affirm the judgment.

I.    Background

¶ 2    One night in June 2020, Costello was visiting his ex-wife while the victim was visiting his ex-girlfriend at an apartment complex. The two women happened to live across the hallway from each other.

¶ 3    The victim was attempting to retrieve his missing cell phone, which he believed was in his ex-girlfriend's apartment.  The ex-girlfriend declined to speak with him, and the victim left the building.  From her balcony, the ex-girlfriend saw him across the street speaking with Costello.

¶ 4    Sometime later, Costello knocked on the ex-girlfriend's door while the victim hid nearby.  When the ex-girlfriend opened the door, Costello blocked it from closing with his foot and demanded that she "[g]ive [the victim] his phone back or I'll kill him."  She

1

shoved Costello's foot out of the doorway, slammed the door shut, and, from her balcony, watched the two men leave the complex.

¶ 5        Costello and the victim walked to a nearby 7-Eleven to buy cigarettes and drinks.  Shortly after the pair returned from 7-Eleven, the ex-girlfriend's brother arrived at the apartment complex with a few other family members.  The victim — no longer accompanied by Costello — approached the brother and asked him to "tell your sister to come talk to me and give me my phone."  The ex-girlfriend overheard this and yelled down for the victim to "go away" because she "[did not] want to talk to him."  The brother and his family then entered the ex-girlfriend's apartment.

¶ 6        Almost immediately thereafter, the ex-girlfriend and her brother heard a loud bang.  When the brother looked over the balcony, he saw the victim lying on the ground near the ex-girlfriend's car.  The victim died from a gunshot wound to the back of the head.

¶ 7        Several surveillance cameras around the apartment complex and at the 7-Eleven recorded Costello — wearing a red hoodie — and the victim walking around together.  And though the video is less than clear, one camera captured the victim walking away from

2

where he was talking to his ex-girlfriend's brother as the brother went inside the apartment building. In the footage, the victim walks out of frame behind the building and is followed by a person seemingly clad in red. Roughly twenty-one seconds later, a gunshot can be heard.

¶ 8     About a month after the shooting, Costello was arrested for the victim's murder. Arresting officers recovered a gun from Costello's waistband along with ammunition of the same caliber and brand as the bullet casing left at the scene of the murder. The gun was loaded with sixteen bullets in a magazine that could hold seventeen rounds, and Costello told a detective that he had the gun with him at the apartment complex on the night of the murder. Two experts in firearm toolmark identification concluded that the cartridge casing from the murder scene was fired from Costello's gun.

¶ 9     A jury convicted Costello of first degree murder, and the district court sentenced him to life in prison without the possibility of parole.

## II.     Analysis

¶ 10     Costello contends that the district court reversibly erred by (1) failing to exclude expert testimony on firearm toolmark identification as unreliable; (2) allowing a second firearm toolmark identification expert to give needlessly cumulative and improper bolstering testimony; (3) permitting a detective to interpret a portion of surveillance footage and identify Costello in it; and (4) admitting unfairly prejudicial evidence by allowing the victim's mother to testify and by accepting an "in-life" photograph of the victim.  He also asserts that the cumulative effect of the errors deprived him of the right to a fair trial.  We address and reject each contention in turn.

### A.     Standard of Review

¶ 11     The district court has broad discretion in determining the admissibility of evidence based on its relevance, probative value, and prejudicial impact.  *People v. Elmarr*, 2015 CO 53, ¶ 20.  This includes the discretion to rule on the admissibility of expert testimony, *Kutzly v. People*, 2019 CO 55, ¶ 8, and to admit allegedly cumulative or bolstering testimony, *People v. Thompson*, 2017 COA 56, ¶ 184; *People v. Renfro*, 117 P.3d 43, 46 (Colo. App. 2004).  We

review these evidentiary rulings for an abuse of discretion. *People v. Quillen*, 2023 COA 22M, ¶ 14. The district court abuses its discretion if its decision is manifestly arbitrary, unreasonable, or unfair, or if the court misapplies the law. *Id.*

### B.  Reliability of Expert Testimony

¶ 12    We first turn to Costello's contention that the prosecution's expert testimony concerning the firearm toolmark identification was unreliable under CRE 702.

### 1.  Additional Background

¶ 13    The prosecution endorsed Eric Thornton, a forensic scientist at the Colorado Bureau of Investigation (CBI), as an expert in firearm functionality and toolmark examination and analysis. Costello objected and requested a *Shreck* hearing, arguing that recent court decisions and reports had expressed concerns about firearm and toolmark analysis.

¶ 14    At the hearing, Thornton testified that firearm toolmark identification is used to determine whether, as relevant here, a cartridge casing found at a crime scene was fired from a particular weapon. Thornton testified that shooting a firearm causes some "small variation" to the individual cartridge cases and, using a

5

comparison microscope, examiners look at markings that are imprinted on the cartridge cases during the firing process. He explained, "If the marks are sufficient in quality and quantity based on my training and experience and applying the [Association of Firearm and Tool Mark Examiners (AFTE)] theory, then it's an identification."

¶ 15    Turning to the firearm evidence in this case, Thornton testified that he compared a test cartridge fired from Costello's gun to the cartridge casing found at the crime scene and concluded that it was fired by Costello's weapon. He testified that his findings were independently verified by another examiner at CBI.

¶ 16    The district court determined that Thornton's technique was reasonably reliable within the scientific community. It found that Thornton's analysis was subject to verification by a peer; that AFTE publishes scholarly articles studying the firearm toolmark identification standards; and that there was a study that found a potential error rate of 1 in 66 or, conversely, a 98.5% accuracy rate for the type of analysis conducted by Thornton. The court then found that the evidence offered would be helpful in deciding whether the cartridge casing found at the crime scene could be

6

linked to Costello's gun. And the court noted that defense counsel's criticisms of Thornton's method of identification could be presented through cross-examination.

¶ 17    At trial, both Thornton and Dale Higashi, who verified Thornton's findings, opined that the cartridge casing found near the victim was fired from the firearm in Costello's possession at the time of his arrest. Both experts testified their identification was based on a "reasonable degree of scientific certainty." They were cross-examined extensively about the reliability of their opinions.

## 2.    Applicable Law

¶ 18    CRE 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." To determine whether expert testimony is admissible under CRE 702, the court must make determinations as to (1) the "reliability of the scientific principles"; (2) the "qualifications of the witness"; (3) the "usefulness of the testimony to the jury"; and (4) whether the evidence satisfies CRE 403. *People v. Shreck*, 22 P.3d 68, 70 (Colo. 2001).

7

¶ 19    The court's reliability inquiry is broad in nature and considers the totality of the circumstances of a given case. *People v. Ramirez*, 155 P.3d 371, 378 (Colo. 2007). The standard for admissibility is reliability, not certainty. *Est. of Ford v. Eicher*, 250 P.3d 262, 266 (Colo. 2011). Thus, the proponent need not prove that the expert is indisputably correct. *Ramirez*, 155 P.3d at 378. Rather, reliability analysis hinges on whether the scientific principles the expert employed are grounded in the methods and procedures of science. *Est. of Ford*, 250 P.3d at 267. If so, the testimony meets the reliability requirement. *Id.*

¶ 20    In conducting the reliability inquiry, there is no mandatory list of factors that a court must consider. *See Kutzly*, ¶ 12. But it may consider (1) whether the technique has been tested; (2) whether the technique has been subjected to peer review and publication; (3) the known or potential rate of error; (4) whether the technique has been generally accepted; (5) the relationship of the proffered technique to more established modes of scientific analysis; (6) the existence of specialized literature dealing with the technique; (7) the non-judicial uses to which the technique is put; (8) the frequency and type of error generated by the technique; and (9) whether such evidence

8

has been offered in previous cases to support or dispute the merits of a particular scientific procedure. *Est. of Ford*, 250 P.3d at 267-68. Some of these factors may be inapplicable in a particular case, and a court may consider any other appropriate factors or information in its reliability analysis. *Id.* at 268.

¶ 21 Our supreme court has emphasized that the standard for admitting expert testimony is liberal because any admitted testimony will be further vetted through vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof. *Shreck*, 22 P.3d at 78.

### 3. Discussion

¶ 22 Applying the reliability factors, we conclude that the district court did not abuse its discretion by finding that Thornton's testimony was scientifically reliable.

- First, the toolmark identification methodology that both Thornton and Higashi utilized has been tested. *See United States v. Harris*, 502 F. Supp. 3d 28, 37 (D.D.C. 2020) ("A number of courts have examined this factor in depth to conclude that firearm toolmark identification can be tested and reproduced.").

9

- Second, firearm toolmark identification is not a novel technique; it has been used as a scientific mode of analysis since the early twentieth century. Stephen G. Bunch et al., *Is a Match Really a Match? A Primer on the Procedures and Validity of Firearm and Toolmark Identification*, 11 Forensic Sci. Comm., (July 2009), https://perma.cc/3ZY7-LCWC. Thus, it is a generally accepted method of identifying toolmarks left by a gun on bullets or cartridge casings. *See Harris*, 502 F. Supp. 3d at 42 ("[T]he AFTE theory . . . enjoys widespread scientific acceptance.").

- Third, Thornton testified that firearm toolmark identification has been the subject of peer reviewed publications for over seventy years. *See id.* at 40 ("[T]he toolmark identification methodology . . . has been subject to peer review and publication . . . .").

- Fourth, one study found an error rate for firearm toolmark identification of 1 in 66 — a 98.5% accuracy rate. Moreover, Thornton's findings were independently verified by another toolmark examiner to reduce the likelihood of error. *See also id.* at 39 ("Because the evidence shows that

10

error rates for false identifications made by trained examiners is low . . . this factor also weighs in favor of admitting [the] expert testimony.").

- Fifth, as the district court observed, "firearm and toolmark [identification] has never been found to be inadmissible under *Shreck* in the state Colorado." Indeed, Thornton has been admitted as an expert witness on firearm toolmark identification in approximately thirty cases.

¶ 23 Costello nevertheless argues that the district court "erred in finding that the underlying principles behind firearm[] toolmark identification were reliable" because another division of this court and other jurisdictions have questioned the admissibility of such evidence and because recent research has called into question the reliability of firearm toolmark identification.

¶ 24 Costello's reliance on *People v. Genrich*, 2019 COA 132M, is misplaced. The issue in *Genrich* was the reliability of an expert's unqualified opinion regarding identification of marks on a wire allegedly made by a hand tool. *Id.* at ¶¶ 21-23, 31. In contrast, this case involves an analysis of marks left by a firearm on cartridge casings. The concurrence in *Genrich* explained that "[t]he analysis

11

of toolmarks left on a surface by a hand tool is inherently more subjective than the analysis of toolmarks left by a gun on bullets or cartridge casings" and therefore "[o]pinions from other jurisdictions concluding that firearms identification testimony is admissible bear little weight here because of the differences between toolmark identification analysis for firearms and hand tools." *Id.* at ¶¶ 125-126 (Berger, J., specially concurring).

¶ 25 Costello also relies on a handful of cases to argue that "other jurisdictions have recognized the growing concerns about the admissibility of long-accepted firearm identification testimony." *See Williams v. United States*, 210 A.3d 734 (D.C. 2019); *United States v. Willock*, 696 F. Supp. 2d 536, 564 (D. Md. 2010); *United States v. Glynn*, 578 F. Supp. 2d 567, 570 (S.D.N.Y. 2008); *Sexton v. State*, 93 S.W.3d 96 (Tex. Crim. App. 2002). But *Williams*, *Willock*, and *Glynn* did not hold that firearm toolmark identification testimony is categorically unreliable and therefore inadmissible; instead, in each of these cases the court admitted the testimony while limiting the levels of certainty the experts could express in their opinions. *See Williams*, 210 A.3d at 743; *Willock*, 696 F. Supp. 2d at 573; *Glynn*, 578 F. Supp. 2d at 575.

12

¶ 26    Indeed, federal courts, almost without exception, have admitted firearm toolmark identification evidence under Rule 702. *See United States v. Brown*, 973 F.3d 667, 704 (7th Cir. 2020) (noting that the AFTE "methodology used by the government's witnesses had been 'almost uniformly accepted by federal courts'"); *United States v. Hicks*, 389 F.3d 514, 526 (5th Cir. 2004) ("[T]he matching of spent shell casings to the weapon that fired them has been a recognized method of ballistics testing in this circuit for decades."); *United States v. Monteiro*, 407 F. Supp. 2d 351, 364 (D. Mass. 2006) ("For decades, both before and after the Supreme Court's seminal decisions in *Daubert* and *Kumho Tire*, admission of the type of firearm identification testimony challenged by the defendants has been semi-automatic; indeed, no federal court has yet deemed it inadmissible."); *United States v. Santiago*, 199 F. Supp. 2d 101, 111-12 (S.D.N.Y. 2002) (noting that the "Court has not found a single case in [the Second] Circuit that would suggest that the entire field of ballistics identification is unreliable" and declaring that "the Supreme Court's decisions in *Daubert* and *Kumho Tire*[] did not call this entire field of expert analysis into question"). Costello has not identified any cases, nor are we aware

of any, holding firearm toolmark identification of cartridge casings to be categorically unreliable.

¶ 27    We are not convinced that a 2016 report by the President's Council of Advisors on Science and Technology (PCAST) mandates the conclusion that firearm toolmark identification is categorically unreliable. *See Brown*, 973 F.3d at 703-704 (rejecting the argument that the PCAST report rendered firearm toolmark identification unreliable under Rule 702); *Harris*, 502 F. Supp. 3d at 36-43 (same). Costello argues that this report "represents a landmark publication that alleged a scientific consensus — representing the conclusions of numerous experts — of scientific uncertainty about the reliability of firearm[] toolmark identification evidence." But the report does not suggest that firearm toolmark identification is fundamentally unreliable; instead, it contends that existing "non-black box" studies purporting to quantify the reliability of firearm toolmark identification are flawed and more studies are needed. The report concludes by suggesting that firearm toolmark analysis admitted in courts use the error rate of 1 in 66 from the only "black box" study it found appropriately designed. Notably, this is exactly the error rate on which the

14

district court relied. *But see Harris*, 502 F. Supp. 3d at 39 ("[T]hree black box studies that post-date the PCAST Report all have extremely low rates of error.").

¶ 28 Costello also challenges the reliability of the expert testimony because it was based on subjective analysis, rather than on objective criteria. True, "scientific expert testimony that relies on bare assertions, subjective belief, or unsupported speculation" does not satisfy the reliability requirement. *Est. of Ford*, 250 P.3d at 267. But a methodology is not unreliable if the expert relies on his "training, experience, deductive reasoning, and observations to reach [his] conclusions." *People v. Perkins*, 2023 COA 38, ¶ 44; *see also United States v. Gil*, 680 F. App'x 11, 13 (2d Cir. 2017) ("[A]rguments about the subjectivity inherent in [firearm toolmark identification] go 'to the weight of the evidence, not to its admissibility,' and were 'matters for cross-examination and argument to the jury.'" (quoting *United States v. Romano*, 794 F.3d 317, 333 (2d Cir. 2015))); *Harris*, 502 F. Supp. 3d at 43 (concluding that the subjectivity of the toolmark identification methodology is not fatal to its admissibility under Rule 702).

¶ 29 That was the case here. Although Thornton testified that "we report objective observations interpreted through our subjective experience," he also explained that making an identification requires significant experience working with known samples to understand the variations that can occur. He testified that his technique is based on his intensive training, published peer reviewed papers, and AFTE seminars. And he described how CBI's quality control measures, best practices, and accreditation aim to ensure the accuracy of the tests. Where, as here, an expert employs his "physical investigation, professional experience, and technical knowledge" to reach a conclusion, the court does not abuse its discretion by admitting the expert's testimony. *Perkins*, ¶ 44.

¶ 30 Finally, Costello argues that Thornton's methodology was not scientific because he did not take photographs or notes of the points of comparison. But "[c]oncerns about . . . whether a qualified expert accurately applied a reliable methodology go to the weight of the evidence, not its admissibility." *People v. Shanks*, 2019 COA 160, ¶ 12. And as the district court observed, these points "would be excellent cross examination." *See Shreck*, 22 P.3d

16

at 78.  Moreover, even if we were to assume that Thornton's methodology was not "scientific," that would not presage the exclusion of his testimony because Rule 702 is not limited to admissibility of scientific evidence alone.  It permits the introduction of "technical" or "other specialized" expert testimony that is helpful to the jury.  *See* CRE 702.

¶ 31    Alternatively, Costello argues that even if the toolmark testimony was generally admissible, the trial court erred by not limiting the degree of confidence the experts could express regarding whether the cartridge casing found at the scene was fired from Costello's gun.  Costello sought to preclude the experts from saying that their identification excluded "all other firearms in the world," using phrases like to a reasonable degree of scientific or ballistic certainty, or saying that there was a "match."  He proposed that the experts be limited to saying "something to the effect of, it is more probable than not that these two shell casings came from the same" gun.

¶ 32    A few courts have placed restrictions on the degree of confidence experts can express when making toolmark identifications.  These courts have, for example, prohibited experts

17

from claiming they are 100% certain of a match, that the match excludes all other firearms in existence, or that it was practically impossible for any other gun to have fired the recovered materials. *See United States v. Johnson,* 875 F.3d 1265, 1280 (9th Cir. 2017); *United States v. Ashburn,* 88 F. Supp. 3d 239, 249 (E.D.N.Y. 2015); *United States v. Taylor,* 663 F. Supp. 2d 1170, 1180 (D. N.M. 2009); *Monteiro,* 407 F. Supp. 2d at 375. These qualifications are "meant to ensure that juries are not misled about the reliability of ballistics evidence." *Johnson,* 875 F.3d at 1280. But most of these courts have allowed experts to testify that their identifications were made to a reasonable degree of ballistic certainty. *See id. But see Glynn,* 578 F. Supp. 2d at 575 (precluding the expert from testifying to a match based on a reasonable degree of ballistic certainty; the expert could only state his opinions in terms of "more likely than not").

¶ 33     Here, the district court did not abuse its discretion by allowing the experts to testify that their identifications were made to a reasonable degree of scientific certainty.[1] However, to the extent

---

[1] Costello does not argue that "reasonable degree of scientific certainty" and "reasonable degree of ballistic certainty" have different meanings or that the experts' use of the former is somehow more prejudicial than the latter.

18

that their testimony could be construed as suggesting that their identifications were 100% accurate or excluded all other firearms in the world, the district court's refusal to limit that portion of their testimony was harmless. *See People v. Summitt,* 132 P.3d 320, 327 (Colo. 2006) (Harmless error analysis "requires an inquiry into whether, viewing the evidence as a whole, the contested evidence substantially influenced the verdict or affected the fairness of the trial proceedings."). The experts repeatedly said their opinions were "to a reasonable degree of scientific certainty" and did not use the term "match" to describe their identification of the cartridge casings. While the experts might have occasionally used shorthand that suggested a higher level of certainty in their opinions, these instances were brief and did not overshadow other admissible testimony. And in closing argument, the prosecutor did not reference those statements, but instead acknowledged that some studies have placed the error rate as high as 1.6%. *See People v. Mendenhall,* 2015 COA 107M, ¶ 69 (concluding an investigator's inadmissible statements were harmless where they "were brief and constituted a small part of his testimony" and were not referenced

in closing argument). Given these circumstances, we conclude that the court's failure to limit the experts' testimony was harmless.

### C. The Second Expert's Testimony

¶ 34 We next consider Costello's contention that the district court erred by failing to exclude Higashi's expert testimony because it was needlessly cumulative and unfairly bolstered Thornton's testimony.

### 1. Applicable Law

¶ 35 A witness is prohibited from testifying that another witness told the truth on a particular occasion. CRE 608(a); *Venalonzo v. People*, 2017 CO 9, ¶ 32. This type of testimony is considered improper "bolstering." *People v. Wittrein*, 221 P.3d 1076, 1081-82 (Colo. 2009). "Testimony that another witness is credible is especially problematic where the outcome of the case turns on that witness's credibility." *Venalonzo*, ¶ 33.

¶ 36 Rule 403 also provides that relevant evidence may be excluded if its probative value is "substantially outweighed" by considerations of "needless presentation of cumulative evidence." CRE 403. But "[t]he fact that evidence is cumulative does not, by itself, render the evidence inadmissible." *Thompson*, ¶ 184 (quoting *People v. Pahlavan*, 83 P.3d 1138, 1140 (Colo. App. 2003)).

## 2. Discussion

¶ 37    We disagree that the district court abused its discretion by not excluding Higashi's testimony.

¶ 38    First, Higashi's testimony did not unfairly bolster Thornton's testimony. Higashi did not testify that Thornton was telling the truth or that his testimony or analysis was credible. Instead, he independently verified Thornton's findings because, as Thornton explained, "we have two people look at everything" to avoid potential errors. Higashi testified that he reviewed the cartridge cases, conducted his own analysis, and independently reached the conclusion that they "were all fired by the same firearm." Although this testimony corroborated Thornton's conclusion, it did not constitute improper bolstering. *See Venalonzo*, ¶¶ 32-33; *Wittrein*, 221 P.3d at 1081-82. "[E]xpert testimony generally tends to bolster or attack the credibility of another witness," but this on its own is insufficient to deny admission of the evidence. *People v. Vanderpauye*, 2021 COA 121, ¶ 60 (quoting *People v. Koon*, 724 P.2d 1367, 1370 (Colo. App. 1986)).

¶ 39    Second, Higashi's testimony was not needlessly cumulative of Thornton's testimony. Though the experts had similar

qualifications and education, they had different roles in CBI's process of firearm toolmark identification. Thornton testified about his role as the primary examiner, which involved test-firing the weapon to produce samples for comparison and comparing those samples to the cartridge casing found at the crime scene. Higashi, on the other hand, testified about his role as the verifier, which involved his own independent analysis of the cartridge casings. Although both experts came to the same conclusion, we cannot say that the court abused its discretion in determining that the probative value of Higashi's testimony was not substantially outweighed by the needless presentation of cumulative evidence. *See* CRE 403. The court could reasonably have found that the testimony of both witnesses was necessary to provide a complete picture of the process used by CBI to analyze the toolmarks left by a firearm. And the district court instructed the jury that "[t]he number of witnesses testifying for or against a certain fact does not, by itself, prove or disprove that fact."

D.     Testimony Interpreting Surveillance Footage

¶ 40     We next turn to Costello's contention that the district court committed reversible error by allowing a detective to offer lay

opinion testimony interpreting a portion of the surveillance footage and identifying Costello in it. We discern no plain error.

### 1. Additional Background

¶ 41 A detective was assigned as the lead investigator of this case. She authored the arrest warrant for Costello, which included a recent mugshot of him, and she conducted a lengthy in-person interview with Costello after his arrest. When the detective testified at trial, the prosecution showed the surveillance footage recorded at the apartment complex — consisting of multiple different camera angles — and asked her to "orient [the jury] on where within the complex th[e] camera is and . . . what area it covers." The detective also, without objection, narrated what she saw in the footage and why that was important to her investigation.

¶ 42 Some of the footage was clear and the detective was able to identify Costello based, in part, on Costello's distinctive hat that she collected upon his arrest. But the footage of the moments before the shooting was less clear. In that footage, two distant figures walk out of frame and roughly twenty-one seconds later a loud gunshot can be heard. While it appears that one of the figures is

wearing red and the other white, no other identifying features are discernable in the footage.

¶ 43    The detective testified about the footage as follows:

> Q. Leading up to the sound that we heard, how many individuals were you able to see?
>
> A. Two.
>
> Q. And were you able to recognize them based on their appearance from other clips that you've seen?
>
> A. Yes.
>
> Q. Who were you able to see in that clip?
>
> A. I see the victim and [Costello].

She later clarified that she identified Costello in the footage because "a glimpse of a person wearing a red sweatshirt passes behind th[e] building."

### 2.    Preservation and Applicable Law

¶ 44    Costello did not contemporaneously object to the detective's testimony, so this issue is unpreserved.  We therefore apply the plain error standard of reversal, which is met only when an error "is obvious and substantial, and . . . so undermines the fundamental fairness of the trial as to cast serious doubt on the reliability of the

24

judgment of conviction." *People v. McFee*, 2016 COA 97, ¶ 71; *Hagos v. People*, 2012 CO 63, ¶ 14.

¶ 45 Under CRE 701, a lay witness may offer an opinion. Colorado Supreme Court precedent construing the rule permits police officers to identify defendants in surveillance footage. *Robinson v. People*, 927 P.2d 381, 384 (Colo. 1996). But there are limits to such testimony: "a lay witness may testify regarding the identity of a person depicted in a surveillance photograph if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than the jury." *Id.* at 382. A lay witness's opinion based on exactly the same information that the jury has cannot be helpful to the jury. *McFee*, ¶ 76.

### 3. Discussion

¶ 46 Costello contends that the detective's testimony was inadmissible lay opinion testimony under CRE 701 and that its admission was plain error. The People contend that the testimony was not improper because, as the lead investigator assigned to the case, the detective was familiar with Costello and therefore more likely than the jury to correctly interpret the surveillance footage. Without deciding whether the district court's admission of the

testimony was error (or obvious error), we conclude that reversal is not warranted because the admission of this evidence, even if erroneous, does not "cast serious doubt on the reliability of the judgment of conviction." *McFee*, ¶ 71.

¶ 47 "Ordinarily, the risk of admitting improper lay opinion testimony of this type is that the jurors will assume that the witness is in a better position to interpret or understand the evidence than they are . . . ." *Id.* at ¶ 78. But here, the detective testified that her identification of Costello in the challenged footage was "based on [his] appearance from other clips" and because, in the footage, "a glimpse of a person wearing a red sweatshirt passes behind th[e] building." Thus, like in *McFee*, the detective's interpretation of this footage was "presented as simply a thirteenth set of [eyes], albeit a set of [eyes] belonging to a police officer." *Id.*

¶ 48 Costello also cross-examined the detective regarding her identifications, and the detective conceded that the distinct clothing and facial features that allowed her to identify Costello were not discernible in the less clear surveillance footage. *See People v. Vasquez*, 155 P.3d 588, 595 (Colo. App. 2006) (holding that admission of a police officer's testimony in which he identified a

man in a photograph as the defendant was harmless where the defendant had the opportunity to cross-examine the officer on his testimony).

¶ 49    The jury watched each of the recordings, heard Costello's cross-examination of the detective, and was instructed to reach its own conclusions about what happened. *See id.*; *McFee*, ¶ 79. Accordingly, even if it was improper for the detective to identify Costello in the footage, "the jury had no reason to accept [her] opinion and could evaluate [the footage] for itself." *McFee*, ¶ 79.

¶ 50    We are not persuaded otherwise by Costello's assertion that the detective's "interpretation of the video ultimately amounted to an opinion that Costello was guilty and committed the offense," thereby invading the province of the jury. Although the detective identified Costello as the person depicted in the surveillance video, she did not take the additional step of stating that, in her opinion, he committed the charged offense. *See People v. Penn*, 2016 CO 32, ¶ 31; *Gallegos v. People*, 403 P.2d 864, 873 (Colo. 1965) ("[T]o say [the witness] identified the defendants does not give rise to the conclusion that they were, therefore, guilty of the crime charged.").

## E. Testimony by the Victim's Mother and the Photograph of the Victim

¶ 51 We next reject Costello's contention that the district court abused its discretion by permitting the victim's mother to testify and by admitting an "in-life" photograph of the victim because the testimony and the photograph were unfairly prejudicial.

### 1. Applicable Law

¶ 52 Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." CRE 401. But relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. CRE 403.

¶ 53 The balancing test under Rule 403 strongly favors the admission of evidence. *Masters v. People*, 58 P.3d 979, 1001 (Colo. 2002). By requiring that the probative value of the evidence be "substantially outweighed" by the danger of unfair prejudice, "the rule makes clear that the need for exclusion must be great." *Id.* Thus, when reviewing a district court's exercise of discretion under Rule 403, an appellate court must afford the evidence the

28

maximum probative value attributable by a reasonable fact finder and the minimum unfair prejudice to be reasonably expected. *People v. Gibbens*, 905 P.2d 604, 607 (Colo. 1995).

### 2.     Discussion

¶ 54     Costello argues that the victim's mother's testimony and the in-life photograph had minimal relevance and risked unfair prejudice against him.  While we agree with Costello that the evidence did not have much probative value, what probative value it did have was nevertheless not substantially outweighed by the danger of unfair prejudice.

¶ 55     Evidence that the victim "was once alive was of consequence to the charge[] of murder . . . because [the] crime[] require[s] proof that the defendant 'caused the death of a person.'"  *People v. McClelland*, 2015 COA 1, ¶ 49.  And though this point was undisputed, evidence is not inadmissible solely because the issue is stipulated to or established through other testimony.  *See People v. White*, 606 P.2d 847, 849 (Colo. 1980).  Thus, the testimony and photograph had some probative value, albeit a minimal amount, on the elements of the charged crime.

¶ 56     Turning to prejudice, the testimony of the victim's mother was brief and almost exclusively biographical, and the photograph was a simple, relatively unexpressive headshot of the victim without any other people in it. Immediately before the mother began to testify and the photograph was admitted, the district court instructed the jury that it could not be influenced by sympathy. Absent evidence to the contrary, we presume the jury followed this instruction. *See People v. Carter*, 2015 COA 24M-2, ¶ 59.

¶ 57     Given the court's instruction and the limited nature of the testimony, Costello does not explain how allowing the victim's mother to testify risked unfair prejudice. Instead, he focuses his argument almost entirely on the admission of the in-life photo of the victim. Relying on *McClelland*, Costello argues that the photo was unfairly prejudicial because it portrayed the victim in a different light than the testimony did.

¶ 58     In *McClelland*, the division held that the district court erred by admitting three in-life photos of a homicide victim smiling with his family and son because (1) they contrasted with eyewitness testimony that the victim was "yelling and intoxicated immediately prior to the shooting," and (2) the prosecution "unfairly capitalized"

30

on the photos by using them to elicit the jury's sympathy during opening statement and closing argument. *McClelland*, ¶¶ 52, 56.

¶ 59 For three reasons, this case is distinguishable from *McClelland*. First, and most importantly, in *McClelland*, the defendant asserted he acted in self-defense and the victim's "demeanor immediately prior to the shooting was a crucial issue at trial." *Id.* at ¶ 55. In this case, conversely, the victim's conduct was not relevant to the shooting. And although the photo did contrast somewhat with testimony about the victim's demeanor the night of the shooting, it did so to a lesser degree than in *McClelland*, where the victim had been described as "yelling and intoxicated." *Id.* at ¶ 52. Second, the People did not highlight the photo or use it to generate sympathy in closing like the prosecution did in *McClelland*. *See id.* The prosecutor here showed the photograph during opening statements but did not otherwise reference it aside from having the victim's mother authenticate it. Third, only a single in-life photograph of the victim was admitted, as opposed to the three photos of the victim with his family in *McClelland*. *See id.* at ¶ 57 (noting that the district court could consider allowing fewer in-life photographs on retrial).

¶ 60    Thus, giving the challenged testimony and photograph the maximum probative value and minimal prejudicial effect, *Gibbens*, 905 P.2d at 607, we conclude that the district court did not abuse its discretion by admitting the evidence.

## F.    Cumulative Error

¶ 61    Finally, we reject Costello's contention that the cumulative effect of the alleged errors in his trial mandates reversal.

¶ 62    We have identified one error — failing to limit the firearm toolmark identification experts' testimony — and assumed another — allowing the detective to interpret the surveillance footage — for the purpose of our analysis.  Having concluded that neither error individually warranted reversal, we further conclude that the two errors did not "collectively prejudice the substantial rights" of Costello to the extent that we should reverse his conviction for first degree murder.  *Howard-Walker v. People*, 2019 CO 69, ¶ 25.

## III.    Disposition

¶ 63    The judgment is affirmed.

JUDGE HARRIS and JUDGE GRAHAM concur.