24CA0740 Mukendi v Schrock 07-03-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA0740
Jefferson County District Court No. 19CV30826
Honorable Randall C. Arp, Judge
Honorable Chantel Contiguglia, Judge

---

Raphael Mukendi,

Plaintiff-Appellee,

v.

Bradley Schrock,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE GOMEZ
Freyre and Meirink, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced July 3, 2025

---

Franklin D. Azar & Associates, P.C., Joseph A. Sirchio, Timothy L. Foster, Denver, Colorado, for Plaintiff-Appellee

Messner Reeves LLP, Caleb Meyer, Adam Royval, Denver, Colorado, for Defendant-Appellant

¶ 1 Defendant, Bradley Schrock, appeals the trial court's entry of judgment on a jury award of about $725,000 in past medical expenses to plaintiff, Raphael Mukendi, arising out of a car accident. Schrock contends that the trial court erred by (1) denying his motion for a directed verdict and (2) excluding expert testimony regarding the reasonable value of Mukendi's medical treatment. We disagree and therefore affirm the judgment.

## I. Background

### A. The Underlying Dispute

¶ 2 This case arose out of a car accident in which Schrock's car crossed the center line into oncoming traffic and collided head-on with Mukendi's car, injuring Mukendi. Emergency medical personnel extracted Mukendi from his car and rushed him by ambulance to University of Colorado Hospital (UCH), a Level 1 trauma center. There, doctors treated him for eleven days and performed multiple surgeries to treat his injuries. He was then transferred to Swedish Medical Center (SMC), also a Level 1 trauma center, for a week of continued treatment. Then, he was moved to a rehabilitation center for another month of care.

¶ 3     Mukendi brought this action against Schrock, asserting claims of negligence and negligence per se.

### B.    The First Trial

¶ 4     Prior to trial, Schrock indicated his intent to challenge whether the amounts Mukendi was billed for his medical treatment represented the reasonable value of that treatment.  As part of that strategy, Schrock indicated that he planned to call Richard Lacy as an expert in "bill review."  The trial court granted Mukendi's motion to exclude Lacy's testimony, reasoning that "[t]he Court cannot find that [Mukendi] chose UCH and [SMC] to perform his medical services," given that he was rushed to UCH from the accident scene and was later transferred to SMC; "the best evidence of [Mukendi's] medical expenses are the amounts that he was billed"; and "Lacy's calculation of the market value of those services is not relevant or helpful for this case."

¶ 5     At trial, Mukendi introduced a CRE 1006 summary of his medical bills, which totaled nearly $740,000.[1]  He introduced no other evidence directly showing that the billed amounts reflected

---

[1] It is undisputed that Mukendi's private insurer paid his medical bills at a discounted rate.

the reasonable value of his medical treatment. Toward the close of Mukendi's case-in-chief, Schrock moved for a directed verdict on damages for medical expenses on the grounds that Mukendi hadn't proved that the billed amounts represented the reasonable value of the medical services he received. The trial court denied the motion.

¶ 6 The jury determined that Schrock drove negligently and caused the accident. In addition to other damages, the jury awarded Mukendi almost $775,000 for economic losses, including his reasonable and necessary medical expenses. The trial court entered judgment accordingly.

### C. The First Appeal

¶ 7 As relevant here, in the first appeal, Schrock contended that the trial court erred by (1) excluding Lacy's expert testimony and (2) denying his motion for a directed verdict. A division of this court affirmed in part and reversed in part and remanded the case for a retrial on Mukendi's economic damages. *See Mukendi v. Schrock*, (Colo. App. No. 21CA1710, Jan. 12, 2023) (not published pursuant to C.A.R. 35(e)) (*Mukendi I*).

¶ 8 As to the first issue, the division determined that the trial court reversibly erred by excluding Lacy's expert testimony about

3

the reasonable value of Mukendi's medical treatment. *Id.* at ¶¶ 14-48. The division reasoned, in part, that "by choosing the 'best evidence' of reasonable value, the court usurped the jury's role to determine that fact, whether such value is the amount billed, the providers' cost plus a profit margin, or some other amount." *Id.* at ¶ 44. But the division made clear that it was not expressing any opinion on other bases for excluding Lacy's testimony, including any potential lack of reliability. *Id.* at ¶¶ 19 n.2, 35 n.4.

¶ 9     As to the second issue, the division concluded that the trial court didn't err by denying Schrock's motion for a directed verdict because the amount Mukendi was billed for his medical services was "*some evidence* of their reasonable value." *Id.* at ¶ 63.

¶ 10     Based on its rulings, the division remanded the case for a retrial on Mukendi's economic damages. *Id.* at ¶ 65.

### D.     Proceedings on Remand

¶ 11     On remand, Schrock again sought to introduce expert testimony from Lacy, and Mukendi again moved to exclude that testimony. Following a hearing conducted pursuant to *People v. Shreck*, 22 P.3d 68 (Colo. 2001), the trial court excluded Lacy's opinion testimony on the reasonable value of Mukendi's medical

4

services, concluding that Lacy's methodology wasn't sufficiently reliable. However, the court permitted Lacy to testify as an expert as to healthcare provider billing practices in general.

¶ 12   Again, Mukendi introduced a summary of his medical bills pursuant to CRE 1006. Over Schrock's objection, the trial court admitted the summary as Exhibit 15 and found that the exhibit was an accurate summary of the voluminous underlying medical bills.

¶ 13   At the close of Mukendi's case-in-chief, Schrock moved for a directed verdict on Mukendi's claim for medical expenses. Schrock argued that Mukendi had failed to establish the reasonableness and necessity of his medical expenses, particularly because Exhibit 15 shouldn't have been admitted. The trial court denied Schrock's motion, reasoning that Exhibit 15 was admissible and was some evidence of the reasonable value of Mukendi's medical services.

¶ 14   The jury awarded Mukendi about $765,000 in economic damages, including nearly $725,000 in medical economic losses. The court entered judgment accordingly.

## II.   Directed Verdict

¶ 15   Schrock first contends that the trial court erred by denying his motion for a directed verdict on Mukendi's claim for past medical

5

expenses. Relatedly, Schrock asserts that the trial court abused its direction by admitting the summary of Mukendi's medical bills under CRE 1006. We aren't persuaded.

### A. Relevant Legal Principles and Standard of Review

¶ 16 A trial court shouldn't grant a motion for a directed verdict "unless the evidence compels the conclusion that reasonable jurors could not disagree and that no evidence or inference has been received at trial upon which a verdict against the moving party could be sustained." *Gilley v. Oviatt*, 2025 COA 27, ¶ 11 (quoting *MDM Grp. Assocs., Inc. v. CX Reinsurance Co.*, 165 P.3d 882, 885 (Colo. App. 2007)). In considering such a motion, the court must view the evidence in the light most favorable to the nonmoving party and should grant the motion only if there is no evidence to support an element of a claim. *Id.* at ¶¶ 11-12. We review a trial court's ruling on a motion for a directed verdict de novo. *Id.* at ¶ 12.

¶ 17 To recover past medical expenses, a plaintiff must show that "the expenses were reasonable, necessary, and incurred as a result of the injury at issue." *Id.* at ¶ 13. Such a claim for damages may be established by "substantial evidence, which together with reasonable inferences to be drawn therefrom provides a reasonable

basis for computation of the damage." *Id.* (quoting *Palmer v. Diaz*, 214 P.3d 546, 552 (Colo. App. 2009)). Evidence of the amount billed for medical services is "some evidence of the reasonable value of the medical services." *Id.* at ¶ 29; *see also Lawson v. Safeway, Inc.*, 878 P.2d 127, 131 (Colo. App. 1994) (testimony as to the amount a plaintiff was billed for medical services following an injury was some evidence of the reasonable value of those services).

¶ 18 To the extent that our inquiry requires consideration of the trial court's decision on the admissibility of evidence, we review that decision for an abuse of discretion. *Gilley*, ¶ 15. A court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair or is based on a misapprehension or misapplication of the law. *Far Horizons Farm, LLC v. Flying Dutchman Condo. Ass'n*, 2023 COA 99, ¶ 17.

¶ 19 Under CRE 1006, "[t]he contents of voluminous writings . . . which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation." To admit such summary evidence, the proponent must (1) identify the documents underlying the summary and show they are voluminous; (2) establish that the underlying documents are otherwise

admissible evidence; (3) provide the other party with a copy of the summary in advance; and (4) provide the other party a reasonable time and place to examine the documents underlying the summary. *Curry v. Brewer*, 2025 COA 28, ¶ 53; *see also* CRE 1006.

### B.    Admissibility of Exhibit 15

¶ 20    Schrock contends that the trial court abused its discretion by admitting Exhibit 15, the summary of Mukendi's medical bills, under CRE 1006 because (1) Mukendi didn't establish the admissibility of the underlying bills and (2) the summary is inaccurate.  Schrock doesn't dispute that the bills are voluminous and that he was provided copies of them in advance of trial.

¶ 21    For his first contention, Schrock argues that Mukendi failed to lay a foundation for the admissibility of the underlying medical bills.  It is true that "the offering party must lay a foundation for . . . the admissibility of the underlying material" before a CRE 1006 summary may be admitted.  *Int'l Tech. Instruments, Inc. v. Eng'g Measurements Co.*, 678 P.2d 558, 562 (Colo. App. 1983), *superseded by statute on other grounds,* Ch. 107, sec. 3, § 13-17-103, 1984 Colo. Sess. Laws 461.  Nonetheless, we agree with the

trial court that Mukendi laid a sufficient foundation regarding the medical bills.

¶ 22 To the extent that Schrock suggests the underlying bills are inadmissible hearsay, rendering the summary inadmissible, *cf. Curry*, ¶¶ 46-56, he didn't make that argument in a timely manner in the trial court. Rather, his only objection at the time the summary was proffered was that there wasn't sufficient foundation to establish the reasonableness and necessity of the billed charges. Thus, we limit our consideration on appeal to that issue. *See Brooktree Vill. Homeowners Ass'n v. Brooktree Vill., LLC*, 2020 COA 165, ¶ 71 ("If a party makes no contemporaneous objection to the introduction of evidence, we will not review the alleged error on appeal." (quoting *Antolovich v. Brown Grp. Retail, Inc.*, 183 P.3d 582, 600 (Colo. App. 2007))); *State Farm Mut. Auto. Ins. Co. v. Goddard*, 2021 COA 15, ¶ 85 (an objection to evidence on one basis doesn't preserve objections on other bases).

¶ 23 And we discern no abuse of discretion in the trial court's rejection of Schrock's objection that the underlying bills were inadmissible due to concerns about their reasonableness and necessity. As the court noted, the issue of whether the charges

represented in the bills were reasonable and necessary was "the ultimate question for the jury" — not a question that pertained to the admissibility of the bill summary itself.

¶ 24 For his second contention, Schrock argues that Exhibit 15 wasn't an accurate summary. Schrock points to Mukendi's testimony that he didn't review all the medical bills but merely forwarded them to his counsel's office and that he couldn't verify the bills' accuracy. But he ignores other evidence that supports the accuracy of Exhibit 15. In particular, Mukendi testified that Exhibit 15 was "a true and accurate summary of [his] medical bills for the treatment [he] received as a result of this crash." Additionally, Mukendi's counsel admitted that he'd been provided with and had an opportunity to review "all of the underlying bills" comprising Exhibit 15. And in assessing Schrock's objection, the trial court asked repeatedly which portion of the summary he claimed was in error. Schrock never articulated in the trial court — and still has not articulated on appeal — any perceived error in the summary. Thus, as the trial court correctly noted, Schrock's objection went to the weight, rather than the admissibility, of the

summary.  *See Gilley*, ¶ 24; *Airborne, Inc. v. Denver Air Ctr., Inc.*, 832 P.2d 1086, 1090 (Colo. App. 1992).

¶ 25    Accordingly, we conclude that the trial court didn't abuse its discretion by admitting Exhibit 15 as a summary of Mukendi's medical bills under CRE 1006.

C.    "Some Evidence" of Necessity and Reasonableness

¶ 26    Schrock contends that because Exhibit 15 is inadmissible, the trial court erred by denying his motion for a directed verdict.  We've already determined, however, that the trial court didn't abuse its discretion by admitting Exhibit 15 as a summary of Mukendi's medical bills from the accident.  And because the amount billed for medical services is "some evidence of their reasonable value," the trial court properly concluded that there was sufficient evidence to support Mukendi's claim for past medical expenses.  *Gilley*, ¶ 29 (citing *Lawson*, 878 P.2d at 131).

¶ 27    Schrock also contends that a directed verdict in his favor is required because Mukendi failed to establish that the medical treatment he received and the charges billed for that treatment were medically necessary.

11

¶ 28    To the extent that Schrock suggests expert testimony is required to establish whether Mukendi's medical treatment was medically necessary, no such requirement exists.  *See Lawson*, 878 P.2d at 131 (Evidence that medical expenses were reasonable and necessary "does not have to be in the form of expert testimony.").

¶ 29    The two cases Schrock cites on this issue are inapposite.  Both cases applied a previous statutory requirement that a plaintiff seeking to recover in tort following a car accident must establish that they had a reasonable need for medical services reasonably valued at over $2,500 based on the average cost of services published by the insurance commissioner.  *See Neiberger v. Fed Ex Ground Package Sys., Inc.*, 566 F.3d 1184, 1186 (10th Cir. 2009) (citing § 10-4-714(1)(e), C.R.S. 2002); *Jorgensen v. Heinz*, 847 P.2d 181, 182-83 (Colo. App. 1992) (same).  That statute was repealed long before the accident here and does not apply in this case.  *See* Ch. 255, sec. 8, 1997 Colo. Sess. Laws 1452.  Additionally, the court in *Neiberger* indicated that expert evidence was needed in that case to establish causation — that the medical expenses at issue were caused by the subject accident and not by the plaintiff's other health conditions.  566 F.3d at 1193.  No such causation issues are

presented in this case.  And the plaintiffs in *Jorgensen* offered little evidence of their claimed injuries, *see* 847 P.2d at 182-83, whereas Mukendi introduced substantial evidence of his injuries and the treatment he received for them.

¶ 30    The following evidence was sufficient to support a finding by the jury that the medical treatment Mukendi received and the charges billed for that treatment were medically necessary:

- Mukendi's testimony about the accident and his injuries from it, including broken ribs, a broken sternum, multiple leg fractures, and a part of one of his hands that "was detached from the bone";

- photos from the scene showing the damage to Mukendi's car and an open fracture on his leg;

- Mukendi's testimony that his situation after the accident was "critical" and that the medical treatment he received "saved [his] life";

- Mukendi's testimony about the medical treatment he received at UCH, including "more than three surgeries";

- medical records from UCH detailing Mukendi's diagnoses, the procedures performed on him during his stay there, and the providers' treatment summaries;

- Mukendi's testimony about his transfer to SMC and the medical treatment he received there;

- medical records from SMC detailing Mukendi's injuries, diagnoses, and treatment plan while in that hospital;

- a colorized x-ray showing the fractures in Mukendi's leg;

- a photo of Mukendi in a hospital bed with medical personnel tending to his leg; and

- Mukendi's testimony that he believed his medical bills were reasonable.

¶ 31 While Schrock cites other evidence that might have supported a verdict in his favor (particularly as to Mukendi's ability to assess the reasonableness of his medical bills), we cannot say that the evidence admitted at trial was insufficient to establish the medical necessity of the treatment and the bills. *See Gilley*, ¶¶ 11-12.

¶ 32 Therefore, we conclude that the trial court didn't err by denying Schrock's motion for a directed verdict. Indeed, the division in *Mukendi I* held as much based on similar evidence

14

presented in the first trial, and we agree with its assessment.  *See Mukendi I,* slip op. at ¶¶ 61-64.

## III.   Expert Testimony

¶ 33    Alternatively, Schrock contends that the trial court abused its discretion by excluding Lacy's expert testimony about the reasonable value of Mukendi's medical services.  We disagree.

### A.    Relevant Legal Principles and Standard of Review

¶ 34    CRE 702 governs the admissibility of opinion testimony by expert witnesses.  Under this rule, a witness may be qualified to provide expert testimony based on knowledge, skill, experience, training, or education.

¶ 35    An expert's testimony is admissible under CRE 702 when (1) the scientific principles at issue are reasonably reliable; (2) the witness is qualified to opine on those principles; (3) the testimony is useful to the jury; and (4) the probative value of the evidence outweighs any potential prejudice.  *Est. of Ford v. Eicher*, 250 P.3d 262, 267 (Colo. 2011).

¶ 36    In determining the reliability of an expert's methodology under the first element of this test, a trial court may consider the following nonexclusive list of factors:

(1) Whether the technique can and has been tested;

(2) Whether the theory or technique has been subjected to peer review and publication;

(3) The scientific technique's known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation;

(4) Whether the technique has been generally accepted;

(5) The relationship of the proffered technique to more established modes of scientific analysis;

(6) The existence of specialized literature dealing with the technique;

(7) The non-judicial uses to which the techniques are put;

(8) The frequency and type of error generated by the technique; and

(9) Whether such evidence has been offered in previous cases to support or dispute the merits of a particular scientific procedure.

*Id.* at 267-68; *see also Shreck*, 22 P.3d at 77-78.

¶ 37    The court must consider the totality of the circumstances and is not restricted to these specific factors. *Ford*, 250 P.3d at 266.

¶ 38    The trial court is granted broad discretion over the admissibility of expert testimony; thus, we will not overturn its

decision absent an abuse of discretion. *Bocian v. Owners Ins. Co.*, 2020 COA 98, ¶¶ 63-64.

## B.    Additional Facts

¶ 39    In response to Mukendi's motion to exclude Lacy as an expert witness, the trial court held a *Shreck* hearing to determine the reliability of Lacy's methodology for calculating the reasonable value of medical services.  There was no dispute that Lacy was qualified to opine on the reasonable value of medical services and that his testimony would be helpful to the jury.

¶ 40    During the hearing, Lacy explained his methodology for calculating the reasonable value of the medical services Mukendi received from UCH and SMC.

¶ 41    First, Lacy determined UCH's and SMC's costs to provide the services Mukendi received.  To do this, he used each hospital's cost-to-charge ratio, representing the amount a hospital bills compared to the hospital's cost to render services.  The ratio for each hospital was published and calculated by the Colorado Department of Health Care Policy and Financing.  The department's report indicated that, on average across their entire range of services,

UCH's and SMC's costs during the time period at issue were roughly 17% and 12%, respectively, of what they bill patients.

¶ 42    Using these ratios, Lacy determined that the nearly $510,000 that UCH billed Mukendi for medical services only cost UCH about $85,000, and the nearly $90,000 that SMC billed Mukendi only cost SMC about $10,000.

¶ 43    Next, Lacy added a profit margin of 45% to UCH's value and 35% to SMC's value.  Lacy acknowledged, however, that the published profit margins for UCH and SMC were around 20% during the relevant period.  Lacy stated that he usually applies a profit margin of between 35% and 75%, and that he chose the 45% and 35% margins here because "this was . . . a very costly admission because it was a level one trauma."  He also indicated that he used a higher profit margin for UCH because it is a teaching facility (which allows it to demand a premium for its services) and it has a relatively high proportion of Medicaid and indigent patients (which requires it to seek higher reimbursement from insured patients to offset the losses associated with treating Medicaid and indigent patients).

¶ 44    Then, Lacy added an additional 200% because UCH and SMC are Level 1 trauma centers, which he described as "a costly designation" that "adds an additional premium to [a hospital's] services particularly when [L]evel 1 trauma is activated."

¶ 45    Using these calculations, Lacy estimated that the reasonable value of the medical services UCH provided to Mukendi was about $250,000, compared to the roughly $510,000 it billed. Lacy also estimated that the reasonable value for SMC's medical services for Mukendi was about $30,000, compared to the roughly $90,000 it billed.[2]

¶ 46    The trial court decided to exclude Lacy's opinion testimony regarding the reasonable value of Mukendi's medical services. In reaching this conclusion, the court analyzed each of the nine factors enumerated in *Ford* and *Shreck*. The court determined:

> 1. It was unclear whether Lacy's methodology could be and had been tested, and Lacy's result seemed to be approximately the amount that Mukendi's insurer paid.

---

[2] Lacy used a different methodology for ascertaining the reasonable value of physician services. But the trial court didn't focus on that methodology in its ruling, and the parties don't focus on it in their appellate briefs.

2. Lacy's methodology hadn't been subjected to peer review or publication. Although he testified that hospitals and insurance providers use the same process, that is for a different purpose — determining what is going to be paid on a case-by-case basis as opposed to ascertaining the reasonable value of services provided. And while the cost-to-charge ratio was based on public reports, the multipliers Lacy applied were not.

3. There was published criticism about the use of the cost-to-charge ratio, particularly its lack of precision when considering the type of payor or the severity of an illness. Otherwise, there was no known or potential rate of error for Lacy's methodology.

4. Lacy's methodology had not been generally accepted because, as Lacy testified, so far as he knows, he is the only person who uses his methodology for the purpose of determining the reasonable value of medical services for which a plaintiff seeks damages.

5. There was no evidence showing a relationship between Lacy's methodology and more established modes of scientific analysis.

6. Lacy acknowledged that there is no specialized literature pertaining to the methodology he employs.

7. While this methodology has been used for at least twenty years, it has been used in the context of negotiations between healthcare providers and insurers to determine rates for payment — not in determining the reasonable value of a plaintiff's medical services.

8. There was no way to measure the frequency or type of error generated by this methodology because there was no way to exactly measure the reasonable value of medical services provided.

9. There was insufficient information regarding previous cases to support or dispute the merits of Lacy's methodology. Mukendi had directed the court to seven cases where Lacy wasn't permitted to testify, but none of those addressed the reliability of Lacy's methodology. And even though Lacy had stated that he'd testified a

number of times, it wasn't clear whether that testimony had been challenged on reliability grounds.

¶ 47    The court also highlighted several additional concerns it had with Lacy's methodology:

- The cost-to-charge ratio is imprecise when considering different payor types and illness severity.  It also wasn't clear what factors that ratio takes into account — for instance, whether it applies to a payor with private insurance and whether it accounts for the cost of hospital construction and equipment.

- It wasn't clear where Lacy's usual profit margin range of 35% to 75% comes from, particularly when some of his considerations for applying a higher profit margin in some circumstances should've been accounted for in the cost-to-charge ratio.  Lacy testified that he now uses a "more conservative" 75% profit though he didn't do so in this case.  It seemed that Lacy may be doing so in order to make his opinions more acceptable to judges and jurors.

- The 45% profit margin used for UCH in this case seemed "somewhat arbitrary and unsupported by logical reasons."

- "More arbitrary was [the] use of 200 percent as a multiplier." The explanation that this number was used due to both hospitals being Level 1 trauma centers didn't make logical sense because the associated costs should already be built into the cost-to-charge ratio. And the court "did not hear anything from [Lacy] to suggest that [the multiplier] wasn't just an arbitrary number that he came up with to try to get to the number he came to."

- It wasn't clear whether or how Lacy's methodology takes into consideration the hospitals' actual patient demographics and payment sources.

- Lacy's calculation approximately equaled what Mukendi's insurer had paid, which could indirectly implicate the collateral source rule. *See* § 10-1-135(10)(a), C.R.S. 2024 ("The fact or amount of any collateral source payment or benefits shall not be admitted as evidence in any action against an alleged third-party tortfeasor . . . .").

23

¶ 48    Ultimately, the court concluded that the threshold of reliability had not been met because "[t]oo much of Mr. Lacy's opinion and methodology is arbitrary and without the needed support" and because his opinion represented only "one man's opinion of how to establish value and not a scientific methodology to reliably calculate the reasonable value of the services provided."

## C.    Reliability Analysis

¶ 49    Schrock contends that the trial court erred by concluding that Lacy's methodology wasn't sufficiently reliable.  He describes Lacy's opinions as "supported by detailed analysis of provider-specific cost-to-charges data, reported profit margins, and pertinent profit and costs multipliers in context of healthcare market factors, based on his decades of experience in managed care contracting."  Thus, he urges, the opinions should've been admitted.

¶ 50    We acknowledge that portions of Lacy's calculations relied on published and peer-reviewed values — like the cost-to-charge ratios published by the Colorado Department of Health Care Policy and Financing.  Lacy also offered explanations for selecting higher profit margins for UCH and SMC than they reported in the relevant period and for applying a 200% multiplier.

24

¶ 51     Regardless, we entrust the decision on the admission of expert testimony to the trial court's sound discretion, even if rational decisionmakers might reach different results. *See E-470 Pub. Highway Auth. v. Revenig*, 140 P.3d 227, 230-31 (Colo. App. 2006) (in assessing whether a court abused its discretion, "we ask not whether we would have reached a different result but, rather, whether the trial court's decision fell within a range of reasonable options"). On this record, the court's decision that Lacy's methodology was unreliable fell within the wide range of reasonable options and was, therefore, not an abuse of discretion. Moreover, the court applied the correct standards and fully explained its rationale, including making findings as to all of the relevant factors and voicing various other concerns with the proposed testimony.

¶ 52     We disagree with Schrock's assertion that the trial court's ruling "defies" the holding in *Mukendi I* that "Lacy's testimony does not implicate the . . . collateral source rule and is thus not excludable on this basis." *Mukendi I*, slip op. at ¶ 42. The division in *Mukendi I* determined that Lacy's testimony didn't directly implicate the collateral source rule because he wasn't proposing to testify about the amounts UCH and SMC had accepted as payment

from Mukendi's insurer. *See id.* The trial court's ruling in this case doesn't defy that ruling; it merely notes, as one of several concerns with Lacy's methodology, that Lacy's calculations might *indirectly* implicate the collateral source rule, given that they seemed to be arbitrary and they happened to result in figures that approximated the amounts Mukendi's insurer had paid.

¶ 53    Lacy testified that he doesn't know of any other person or institution that uses his methodology for the same purpose of calculating the reasonable value of a plaintiff's medical services. While hospitals may rely on the cost-to-charge ratio in negotiating reimbursement rates with insurers, Lacy couldn't identify anyone who used that ratio in conjunction with his other values to calculate the reasonable value of medical services. Nor has his overall methodology for these calculations been subject to peer review or publication. And there's no indication that other courts have accepted it under a *Schreck* analysis. Thus, the trial court acted within its discretion in determining Lacy's methodology wasn't sufficiently reliable. *See Ford*, 250 P.3d at 267-68.

¶ 54    Accordingly, we conclude that the trial court didn't abuse its discretion by excluding Lacy's expert opinion testimony regarding the reasonable value of the medical treatment Mukendi received.

## IV.    Disposition

¶ 55    The judgment is affirmed.

JUDGE FREYRE and JUDGE MEIRINK concur.